IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

FRANKLIN LAY,                          )
                                       )
                    Plaintiff,         )
                                       )
vs.                                    )        Case No. 11-3082-CV-S-ODS
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )

## ORDER AND OPINION REVERSING COMMISSIONER'S FINAL DECISION AND REMANDING FOR CALCULATION AND AWARD OF BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his application supplemental security income benefits. The Commissioner's decision is reversed, and the case is remanded with instructions to calculate and award benefits.

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. E.g., Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). When the Commissioner's decision is reversed, it is to be remanded

for reconsideration unless the record conclusively establishes the claimant is entitled to benefits.

Plaintiff was born in March 1959, dropped out of school in the seventh grade, and has prior work experience as a kennel attendant, cord wood cutter, and laborer. He alleges he became disabled on July 2, 2007, and the ALJ found Plaintiff suffers from borderline intellectual functioning, a seizure disorder, COPD, panic disorder, and degenerative disc disease in the lumbar and cervical spine. R. at 13. Plaintiff received benefits until sometime in the middle of June 2006; at that time his benefits were terminated because he was incarcerated in state prison. He was released the following year (on or around Plaintiff's alleged onset date), but there is no indication that the medical condition(s) that originally justified an award of benefits improved in the interim.

Plaintiff was prescribed seizure medication while in prison, but the records indicate the medical staff modified the prescription on a regular basis in an attempt to identify a therapeutically effective dosage. Despite these efforts Plaintiff experienced seizures while incarcerated. The seizures were sufficiently severe and frequent that they affected the prison job Plaintiff was assigned. R. at 46.

In July 2007 (after he was released), Plaintiff sought care at Missouri Baptist Hospital and reported experiencing seizures, headaches and neck and back pain. R. at 411-14. In November 2007, Plaintiff complained of headaches and seizures over the preceding two weeks. He was advised to establish care with a primary physician, and for that reason he began seeing Dr. Marlon Marquino. Dr. Marquino documented Plaintiff's history of seizures, as well as a treatment history marked by numerous changes in medication in an effort to control Plaintiff's seizures. In evaluating Plaintiff's seizures, Dr. Marquino wrote that "[s]ince this patient's seizures have been pretty much uncontrolled over the years and have never been wroked up I will refer him to a neurologist for further evaluation and workup for the seizure disorder." He also prescribed 20 mg of phenobarbital. R. at 367-68. The prescribed dosage proved ineffectual, so the dosage was increased over time; by late January the dosage had

2

been increased to 100 mg.[1]  At that time, Dr. Marquino noted Plaintiff had not seen a neurologist due to financial constraints, but Plaintiff had recently been approved for Medicaid so arrangements would be made again.  R. at 362-64.  In late May, Dr. Marquino noted that Plaintiff was no longer experiencing the "significant" attacks or losing consciousness.  R. at 358-59.  On June 4, 2008, Dr. Marquino completed a Residual Functional Capacity Questionnaire and indicated Plaintiff had more than two to three seizures per week and that Plaintiff was unable to work.  He indicated that when Plaintiff's seizures were uncontrolled they would last three to five minutes but now they lasted "only seconds."  R. at 418-21.  The Court discerns no inconsistency between Dr. Marquino's treatment notes and his RFC because his treatment notes indicated Plaintiff's condition was improved but did not indicate that Plaintiff was seizure-free.

Plaintiff went to Barnes Hospital in St. Louis for a neurological exam in August 2008.  Testing revealed decreased sensation in Plaintiff's and his left extremities.  Plans were made to obtain an MRI of Plaintiff's brain, but in the meantime the doctors decided to decrease his dosage of phenobarbital and replace it with Topamax.  R. at 428-30.  The MRI was performed later that month and revealed chronic lacunar infarctions and evidence of prior hemorrhaging in Plaintiff's right basil ganglia.  R. at 475-76.  At some point, these dosages were altered but the combination of phenobarbital and Topamax was maintained.  Plaintiff continued to experience seizures on a regular basis, though less often than he had in the past.  Plaintiff returned to Barnes Hospital in March 2009.  At that time his seizures were described as "poorly controlled" (he was experiencing two to three "big seizures" and eight to ten "small seizures" per month) and a prescription for Keppra was added to the phenobarbital and Topamax.  R. at 494-96.

With respect to Plaintiff's back and neck,[2] a CT scan performed in October 2007 revealed a congenital fusion at C3-4 and degenerative changes at C4 and C7, but no

---

[1]A mistake by the pharmacy resulted in Plaintiff receiving 30 mg in February instead of the 100 mg Dr. Marquino had prescribed.  R. at 360-61.  The problem was rectified the following month.

[2]It appears Plaintiff's pre-incarceration award of benefits was based on limitations imposed by his back.  R. at 35

3

acute fractures or dislocations were observed.  R. at 410.  X-rays were takeal n in December and revealed "[b]ilateral spondylolysis of the L4 . . . with grade 1 spondylolisthesis.  This is usually a chronic condition . . . associated with degenerative changes in the L4-L5 disc space which also suggests that this is a chronic condition.  R. at 399.  Plaintiff's headaches were initially controlled with Tylenol, but in January 2008 Dr. Marquino prescribed Topamax, "which will help with the seizure disorder too."  R. at 365-66.  However, Plaintiff had a negative reaction to the medication and it was changed.  R. at 362-64.  In Februay, Dr. Marquino prescribed Naprosyn.  R. at 360-61.  In May, Plaintiff reported experiencing a sharp pain aggravated by movement and persistent lower back pain aggravating by twisting movement.  Plaintiff exhibited muscle spasms in his neck and lower back, and his lower back was tender.  Dr. Marquino recommended physical therapy and prescribed Flexeril in addition to the Naprosyn, along with Lortab to be taken for severe pain.  R. at 459-60.  Plaintiff reported no improvement after approximately six weeks, and Dr. Marquino arranged for an MRI.  R. at 458.

An MRI and x-rays performed in July 2008 revealed the previously discovered congenital fusion at C3-4, "marked degeneration of the cervical spine with disc space narrowing," with the disc space narrowing most prominent at C4 through C7 and osteophytic ridges and bulges in the same areas.  R. at 461-63.  In August, Dr. Marquino noted Plaintiff's neck was tender and he was exhibiting spasms in his neck and back.  R. at 455-56.  Plaintiff's condition did not change through his remaining visits to Dr. Marquino.

During the hearing, Plaintiff testified that he can sit for sixty to ninety minutes at a time, stand for sixty to ninety minutes at a time, and walk 200 to 300 yards.  He estimated that he could lift up to ten pounds regularly.  He confirmed that he can wash dishes, take out the trash, and dress and groom himself.  R. at 42-43.  He testified that

4

the combination of medication and pain caused him to take two to three naps per day. R. at 47.[3]

The ALJ determined Plaintiff's medical condition could cause the limitations he described. He determined, however, that Plaintiff's testimony was not fully credible because of relatively minor contradictions in the Record. For instance, Plaintiff reportedly told a consulting doctor that he dropped out in the ninth grade. Plaintiff also was reportedly less than completely honest in describing the extent of his past drug use to psychologists evaluating Plaintiff for possible mental disabilities. These contradictions are a poor basis for rejecting Plaintiff's complaints because have so little connection to the matters at hand. These contradictions provide no basis for discounting the medical reports documenting a history of seizures or confirming serious degenerative changes in his spine. It is also too much of a stretch to conclude that a person who falsely claims to have attended two extra years of middle school is exaggerating the pain they are experiencing. The ALJ discounted Dr. Marquino's RFC, allegedly because it was based on Plaintiff's subjective complaints and was not supported by other evidence. This is inaccurate: testing confirmed damage to Plaintiff's brain consistent with a history of seizures. Moreover, the fact that multiple doctors diagnosed the condition, prescribed medication, and described the condition as "uncontrolled" not only contradicts the ALJ's conclusion, but is substantial evidence demonstrating the existence and extent of Plaintiff's condition.

The ALJ concluded Plaintiff could not perform his past relevant work. He also concluded Plaintiff could perform light work, with certain limitations based on Plaintiff's limited ability to read, write, concentrate, and understand or follow complex or detailed instructions. This finding was not supported by substantial evidence in the Record because there was no evidence Plaintiff could perform light work.

---

[3]The Record also establishes Plaintiff suffers from COPD, has a limited ability to read and write, and has an IQ score of slightly above 80. These matters appear to have been properly acknowledged and considered by the ALJ, but there is no need to discuss them in great detail here because of the medical conditions that are prompting the Court's judgment.

Case 6:11-cv-03082-ODS   Document 9   Filed 11/14/11   Page 5 of 7

Even if Plaintiff could perform at the light exertional level, the ALJ's conclusion that there is light work Plaintiff could perform is unsustainable. The ALJ found, based on a vocational expert's testimony, that Plaintiff could work as a ticket taker, fast food worker, or order caller. The problem is that, according to the Dictionary of Job Titles ("DOT"), all of these jobs require the ability to understand and carry out detailed instructions. DOT descriptions can be rebutted, and they must be rebutted if the VE testifies that person can do a job that it would seem they cannot perform. E.g., Young v. Apfel, 221 F.3d 1065, 1070 (8th Cir. 2000). This was not done here. All the VE said was that her testimony was consistent with the DOT. R. at 53. This was not correct statement. It does not acknowledge the difference between the VE's testimony and the DOT, much less rebut the DOT's job descriptions. The Commissioner also points out the VE identified other jobs Plaintiff could perform, but the ALJ did not find Plaintiff could perform those jobs. Critically, the ALJ found Plaintiff could sustain concentration for only "two-hour segments over an eight-hour period." R. at 15. This aspect of the RFC was not incorporated in the hypothetical questions posed to the VE, and there is no evidence suggesting Plaintiff could perform those other jobs (electrode cleaner, bench assembler, or small products assembler) with such a limitation on the ability to concentrate – much less considering the effects of his seizure disorder and limited ability to sit and stand.

In conclusion, the Court holds the Record establishes Plaintiff is more severely limited than found by the ALJ. Even so, the ALJ found Plaintiff could not perform his past relevant work, which meant the burden shifted to the Commissioner to demonstrate there are jobs existing in the national economy that Plaintiff can perform. E.g., Jones v. Astrue, 619 F.3d 963, 971 (8th Cir. 2010). The Commissioner failed to make this showing. Remanding so the Commissioner can try a second time in light of a more restrictive RFC will simply delay the inevitable conclusion that Plaintiff cannot perform work in the national economy.

The Commissioner's final decision is reversed, and the case is remanded for a calculation and award of benefits based on Plaintiff's amended alleged onset date of July 2, 2007.

6

IT IS SO ORDERED.


                                         /s/ Ortrie D. Smith
                                         ORTRIE D. SMITH, SENIOR JUDGE
DATE: November 14, 2011               UNITED STATES DISTRICT COURT